# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

Indira Selimovic,

      Plaintiff,

v.

Magna Electric Vehicle Structures —
Michigan, a division of Cosma Canada
USA Group of Magna International Inc.

      Defendant.

Case No.

Hon.

---

PITT, MCGEHEE, PALMER, BONANNI &
RIVERS, P.C.
Michael L. Pitt (P24429)
James O'Dea (P87859)
117 West Fourth Street, Suite 200
Royal Oak, MI 48067
Tel: 248-398-9800
mpitt@pittlawpc.com
jodea@pittlawpc.com

---

## COMPLAINT FOR INJUNCTIVE RELIEF AND MONEY DAMAGES AND JURY DEMAND

Plaintiff Indira Selimovic ("Selimovic") complains of defendant Magna Electric Vehicle Structures —Michigan ("MEVS-MI"), a division of Cosma Canada USA Group of Magna International Inc. ("Magna" or "Company") for a violation of her rights under 42 U.S.C. §1981 and the Elliot-Larsen Civil Rights Act ("ELCRA") MCL 37.2101 et seq.  as follows:

## INTRODUCTION

Indira Selimovic, age 51, was born in Bosnia and speaks with a distinctive Serbo-Croatian accent and is a practicing Muslim. Selimovic, employed at Magna's MEVS-MI plant in St. Clair County in the Quality Department since January 2022, felt welcomed and respected by management and her co-workers until co-worker DeAnn Higgins ("Higgins") discovered she was a practicing Muslim. This discovery unleashed a torrent of hatred and bigotry resulting in Selimovic and other co-workers complaining about the hostile working environment to Human Resources. When Higgins discovered that Selimovic told Human Resources about her prejudice, Higgins exploded with a tidal wave of insults and threats. Other than relocating Selimovic to a new workstation away from the main harasser, no other efforts were undertaken to curtail the abusive and discriminatory behaviors directed at her. Human Resources completely failed Selimovic in her efforts to secure a safe and harassment-free work environment.

On November 15, 2024, Selimovic was terminated in retaliation for her complaints about the hostile and intimidating work environment and because her mere presence in the workplace triggered Higgins to disrupt the workplace with her incessant humiliation and ridiculing of Selimovic because of her ethnicity and because she was an unwanted Muslim.

Selimovic brings this action for ethnic discrimination and intimidation, national origin and religious discrimination, and retaliation for protesting a violation of her civil rights.  Selimovic seeks an order of reinstatement to the position of Junior Supplier Quality Engineer and compensatory and punitive damages for the outrageous manner in which she was treated by her former employer.

## PARTIES, JURISDICTION AND VENUE

1.      Indira Selimovic is a resident of Kimball Township, located in St. Clair County.

2.      Magna Electric Vehicle Structures —Michigan, is a division of Cosma Canada USA Group of Magna International Inc.

3.      The key events in this matter occurred in the Eastern District of Michigan; therefore, venue is appropriate in this Court.

4.      This Court has subject matter jurisdiction over Plaintiff's claims under 42 U.S.C. §§ 1981, 1981a, and 1988 pursuant to 28 U.S.C. § 1331.

5.      This Court has supplemental jurisdiction over Plaintiff's state-law claims under 28 U.S.C. § 1367, as the facts related to these claims form the same case as the federal-law claims.

## STATEMENT OF FACTS

### Description of Magna and MEVS-MI

6.      Magna is a mobility technology company and one of the world's largest suppliers in the automotive space. Magna's global network includes 342 manufacturing operations and 104 product development, engineering, and sales centers in 28 countries. Magna has a global team of over 179,000 employees and an organizational structure designed to innovate like a startup. Magna has complete vehicle engineering and contract manufacturing expertise, as well as product capabilities involving body, chassis, exterior, seating, powertrain, active driver assistance, electronics, mechatronics, mirrors, lighting, and roof systems.

7.      MEVS-MI, located in St. Clair County, opened in 2021.  It recently added a 740,000 square-foot expansion of its existing facility in St. Clair with 920 new jobs expected. The facility currently supplies steel battery enclosures to General Motors. The facility produces complex structural battery enclosures for electric propulsion vehicles. The facility builds battery enclosures for General Motor's new GMC Hummer EV. This facility will generate a total private investment of $70.1 million and create more than 300 jobs over the next five years.

**Selimovic's Ethnicity and Religion and National Origin and Employment with MEVS-MI**

8.      Indira Selimovic is a female born in Bosnia and whose date of birth is November 1973 (age 51). Selimovic arrived in the United States on May 5, 1998. She is a naturalized citizen.

9.      Selimovic is an ethnic Bosniak and practicing Muslim.

10.      Selimovic's ability to read, write, and speak English as her second language is excellent.  However, Selimovic speaks with a distinctive Serbo-Croatian accent.  For example, words that start with "w" are pronounced as if the word started with a "v" and words that have the "th" letters are pronounced as if the "th" was substituted with "dd."   Welcome is pronounced as "velcome," and "other" is pronounced as "udder," or "everything" is pronounced "everyting."

11.      Selimovic was hired by Magna at its MEVS-MI plant on January 31, 2022, as a Quality Technician.  Her duties consisted of inspecting, accepting or rejecting battery storage units for overall quality and compliance with General Motors Hummer vehicle specifications and completing paperwork documenting the results of her inspection and evaluation.

12.      Assistant Quality Manager Brandon Smith ("Smith") participated in the hiring of Selimovic.

13.      Prior to her employment at MEVS-MI, Selimovic worked at SMR Automotive for 23 years. Selimovic worked her way up from a production employee

making automotive mirrors to the paint shop, Team Lead, and finally to the position of Quality Technician.

14.     On September 21, 2022, Selimovic was promoted to the position of Junior Supplier Quality Engineer ("JSQE"). This was the position she held on November 15, 2024, the day of her termination. Her annual salary as a JSQE was $70,000 plus an attractive benefits package.

15.     Job duties as a JSQE included being responsible for the inspection area, handling the eRFX Supplier software, managing the Internal Material System (IMDS), daily interaction with suppliers, opening/reviewing Supplier Quality Management Platform (QPF) Reports, training quality and production personnel as required, product kickoffs, coordinating and managing supplier sorts, updating systems as needed (hot list, ignition, inspection control plans), data entry, tracking, and analysis.

16.     As a JSQE, Selimovic was expected to learn the Production Part Approval Process ("PPAP"). PPAP is a quality protocol developed by the Automotive Industry Action Group to ensure that suppliers produce parts according to specifications and that errors are detected and corrected on a timely basis.

17.     According to Smith's evaluation of Selimovic in July 2022, "Indira has good written and oral communication skills" and "clearly communicates to all departments through the facility."

18.     Selimovic, at the time of her termination, was a highly regarded JSQE who had mastered or was in the process of mastering all the technical requirements of the position.

**Relevant Information about Selimovic's Co-Workers and Supervision**

19.     DeAnn Higgins ("Higgins") was promoted to the position of Senior Supplier Quality Engineer ("SSQE") at about the same time as Selimovic with the intention that Higgins would mentor Selimovic.

20.     Selimovic' s supervisor on her last day of work was Quality Manager Tim Hakes ("Hakes"). Hakes became the Senior Quality Assurance Manager in late October or early November of 2024, replacing Scott Missentzis ("Missentzis") who was transferred to the position of Production Manager at MEVS-MI.

21.     Selimovic's supervisor was the Quality Manager. Missentzis was Quality Manager from January 31, 2022, until March 2023, when Michael Wallace ("Wallace") was hired as Quality Manager. Missentzis was transferred to the position of Continuous Improvement Manager to make room for Wallace, who was separated from the Company in May 2023.

22.     Missentzis returned to the position of Quality Manager from May 2023 until Jason Lewton ("Lewton") was hired as Quality Manager hired in July 2023 and worked in that capacity until April 2024, when Lewton was separated from the

Company. Missentzis returned the position of Quality Manager until Hakes was hired in late October 2024.

23.    Missentzis was responsible for promoting Selimovic in September 2022 to the position JSQE.

24.    Higgins, a female who is approximately 55 years old, began her employment with Magna in 2012 as a Quality Technician who in worked on various quality assignments prior to starting at MEVS-MI in September 2021.

25.    From September 2022 until mid-April 2023, Selimovic and Higgins were trusted colleagues who were interested in the others' family, regularly discussed extracurricular activities, and seemed to be concerned about the others' welfare.  The text messages between the two co-workers were all positive and friendly.

26.    During this period of time, Higgins and Selimovic would exchange photographs of family members, and they routinely shared family news and personal information.

27.    Examples of this friendly banter are reprinted below:

**The September 21, 2022, text message exchange:**

DeAnn Higgins ("DH"): "You did a great job today."

Indira Selimovic ("IS"): "Thank you.  That means a lot."

………….

IS: Liked "you did a great job today"

DH: "Yes we do…glad you're my partner"

…………..

DH: "Tell Nick (Selimovic's husband) thanks again for the smoothies."

IS: "I did, he said his pleasure, any time :)."

**The April 12, 2023, text message exchange:**

DH: "Karla's birthday is tomorrow…."

IS: "Ok, do you have a card?"

DH: "I will stop at Mayer (sic)before work and get a cake."

…..……

IS: "and I literally drive by Mayers(sic)so no problem at all."

DH: "You're awesome."

**Higgins Discovers Selimovic is Muslim and Begins a Bigoted Attack on Her**

28.    Sometime after April 12, 2023, Higgins noticed that Selimovic had scheduled April 21, 2023, as a vacation day. Higgins asked Selimovic if she had anything fun planned. Selimovic advised Higgins that its "my holiday and I am celebrating with my family."

29.    Higgins ask Selimovic, "What holiday?" Selimovic responded by stating Eid, the Muslim holiday celebrating the end of Ramadan. Higgins googled

Eid and pulled up on her computer screen  https://en.wikipedia.org/wiki/Eid_al-Fir.

After reading the Wikipedia posting, Higgins, while pointed to her computer screen,

said to Selimovic, "I didn't know you were this this [Muslim]."

30.    Selimovic immediately felt uncomfortable and addressed Higgins'

apparent disbelief by stating, "[I am Muslim even though] my eyes are blue, and my

hair is not dark."

31.    Higgins responded by telling Selimovic that "it's not that I care, I just

didn't know."

32.    Higgins began treating Selimovic differently after discovering that she

was Muslim.  For example:

    a.    The friendly and supportive test messages for the most part stopped.

    b.    Higgins repeatedly laughed at and mocked Selimovic's Serbo-Croatian

       accent. For example, Higgins would tell Selimovic in the presence of

       her co-workers to have a "great veekend" and laugh about the mocking.

       Quality Manager Missentzis, whose office was a few feet from Higgins'

       workstation/cubicle would join Higgins in mocking Selimovic's accent.

    c.    Friendly gestures like sharing snacks were curtailed.

    d.    Higgins would insult Selimovic or engage in angry outburst toward her.

    e.    Higgins would not train Selimovic on new processes or practices.

    f.    Higgins assigned Selimovic unmanageable workloads.

g.   Higgins removed tasks from Selimovic which were imperative to solid job performance.

h.   Higgins would alter task assignments and deny that she was altering task assignments.

i.   Higgins would exclude Selimovic from team meetings by not including her on team meeting calendar invites.

j.   During meetings, Selimovic was not allowed to speak or was told to be quiet.

k.   Higgins refused to respond to Selimovic's statements made at meetings.

l.   Higgins falsely accused Selimovic of not following up with suppliers on important issues.

m.   Higgins would nitpick Selimovic's written communications by rejecting communications with trivial errors, like double spacing, missing commas, or the use of insignificant words.

n.   Higgins would publicly show displeasure with Selimovic by sitting at her computer and repeating the word "Fuck" multiple times in quick succession, suggesting that she was fixing Selimovic's errors, causing Selimovic to feel great embarrassment.

o.  Higgins refused to give Selimovic clear instructions, and when Selimovic asked other quality personnel for assistance, Higgins would become irate.

p.  Higgins recruited Assistant Quality Manager Josh Cruz ("Cruz") and Quality Manager Missentzis to assist her in ridiculing, embarrassing, and humiliating Selimovic.

33.  Higgins also engaged in unprofessional workplace behaviors unrelated to Selimovic's ethnicity or religion.  These unprofessional workplace behaviors were designed to embarrass Selimovic. For example, before Wallace was hired, Selimovic noted to her colleagues that she had worked with Wallace at SMR and that she found him to be a "good" manager.  Higgins disliked Wallace before getting to know him and reported him on a Company Hotline as being overly flirtatious with a female subordinate. After Wallace was terminated because of Higgins' complaint, Higgins and Missentzis ridiculed Selimovic because she said he was a "good guy."  Higgins then said to Selimovic, "Wallace was respectful towards you because you aren't attractive and because you are old."

**Human Resources is Notified that Selimovic is Being Harassed and Fails to Take Prompt and Effective Remedial Action**

34.  On September 8, 2023, Quality Manager Lewton called Selimovic into his office and asked her if she was experiencing any problems at work. Unbeknownst to Selimovic, Lewton had received reports from Selimovic's co-

workers that she was being harassed by Higgins and that she was showing signs of mental deterioration because of the harassment.

35.    Selimovic provided Lewton with an incorrect response: she said everything was "fine." Selimovic's answer was based on her fear that her complaint would result in an increase of Higgins' abusive conduct toward her.

36.    Between September 8, 2023, and September 14, 2023, Selimovic learned that her co-workers had already informed Lewton of Higgins' abusive behavior toward her. She realized that it was these co-worker complaints made on her behalf that triggered the September 8, 2023, intervention by Lewton.

37.    On September 14, 2023, Selimovic returned to Lewton for a private conversation. Selimovic thanked Lewton for his concern and confessed that she gave him an incorrect response on September 8, 2024, and with great emotion described Higgins' harassment.

38.    Lewton said to Selimovic, "as you now know the real reason I called you to my office on September 8, 2024, was because your co-workers said you were being discriminated against, humiliated, and made fun of a lot. I have already notified Human Resources."

39.    Lewton then walked Selimovic to the Human Resources office.  On the way to the Human Resources office, Lewton and Selimovic met Assistant Quality Manager Smith who was always supportive of Selimovic.

40.    Lewton, Smith, and Selimovic met with Human Resources representative Stacey Holmes ("Holmes").  Holmes reported to Human Resources Manager Jennifer Riley ("Riley"). Selimovic informed Holmes that the genesis of the harassment was Higgins' discovery that she was Muslim. Holmes asked Selimovic to provide her with a written statement describing the harassment.

41.    Selimovic provided Holmes with a written statement on September 15, 2023, which reads in part:

……………

Fast forward to like the middle of April, DeAnn seen that I had Friday April 21st as a vacation day. She asked me if I had something fun planned, I said It's my holiday and I am celebrating with my family. She said which Holiday? I responded Eld. She googled and pulled up https://en,wikipedia.org/wiki/Eid al-Fitr. DeAnn said "OH I didn't know you were this." I turned and said "What?" looked at the screen where· DeAnn was pointing to the fact it brought up it was a Muslim holiday. I felt uncomfortable and started explaining probably because my eyes are blue, and my hair isn't dark. DeAnn said something like it's not that I care, I just didn't know.

………….

After finding out I was Muslim the text and most of the communication. stopped, the relationship shifted. Insulting remarks, attitude, angry outbursts toward me directly, purposefully leaving me out, avoiding training me, removing tasks that are imperative to job performance (Telling me· I can't watch her do a PPAP in QPF because watching is creepy- here is a book instead), giving unmanageable workloads, changing tasks verbally and then going back and saying that's not what she told me, no proof because it was verbal. Changing tasks unnecessarily ("Oh, you just finished updating all control plans, but I added this detail so they· all have to be redone now and I need them"), withholding important information, saying she can't join my meeting but then going and starting my meeting on her own without even

including me. During meetings even I am not allowed to speak, I am told to be quiet, told she is. talking or if l do get a chance to speak, she doesn't engage or respond to what I have-to say. Lately now I-am being left off meeting invites all together.

……………………………

I have almost walked away from this career I love numerous times; I feel stuck because she is supposed to be my mentor but treats me like the enemy. She is horrible to me, she is hostile and it's to the point I can't sleep, I am on edge and looking over my shoulder waiting for her next issue.

…..…………….

42.     Human Resources did not address the complaint with Higgins or launch an investigation into Selimovic's complaints. Neither Holmes nor Riley spoke to Selimovic after the September 15, 2023, written complaint. Selimovic spoke to Riley only once: on the day she was terminated.

43.     On September 15, 2023, Missentzis told Selimovic that while she  was still at the Human Resources office, Higgins said to him, "oh she is after me, she is with Jason [Lewton] at Human Resources right now."

44.     After Selimovic provided Human Resources her statement on September 15, 2023, Selimovic returned to Holmes on September 18, 2023, to report the retaliation and Higgins' threats like, "snakes, liars, don't bite the hand that feeds you." Selimovic reported that Higgins was swearing, hysterically laughing, and slamming her desk numerous times. She stopped talking to Selimovic completely starting that day and blocked her on social media.

45.     Selimovic's desk was moved September 20, 2023, to the other side of the cubicle section. This move did not curtail the harassment, and this was reported to Holmes. Higgins would still walk around the area where Selimovic's desk was relocated and continue to be verbally rude and make remarks, especially if no one else was present.

46.     If Higgins heard Selimovic working and talking to someone else, she would try to approach and isolate Selimovic and the other person, making comments like, "I didn't know there was a training session here," and coming up behind her back and embarrassing Selimovic by saying things like, "Don't you think you should know that?"

47.     Riley never followed up or spoke with Selimovic at all regarding her complaint from September 15, 2023.

48.     Missentzis, rather than trying to mitigate Higgins' hostility toward Selimovic, would worsen the environment by asking Selimovic, "Indira, where is your bully?" (referring to Higgins).

49.     Throughout 2023, Selimovic endured escalating bullying, humiliation, the "silent treatment," and discrimination, resulting in a decline of her overall well-being and health.

## During 2024 the Harassment Continues Unabated by Human Resources
## or Management

50.     On January 5, 2024, Selimovic and Lewton met with Holmes and advised her that Higgins continued to scream at Selimovic, ridicule her accent, and continued the hostile and intimidating conduct. Holmes listened but took no action to ameliorate the working conditions.

51.     On January 19, 2024, Higgins approached Heather Cooley ("Cooley"), Quality Systems Coordinator at MEVS-MI and Selimovic's co-worker in an effort to get Selimovic in trouble.

52.     According to Cooley, "DeAnn [Higgins] approached my desk wanting to compliment me on the email I sent earlier…. I said thanks but I didn't know what email you are talking about. She aggressively shoved the folders that I had hanging over the edge of my desk and said that one you wrote for Indira!"

53.     Higgins pointed her finger at Cooley and said, "you're going to be in trouble because Assistant Quality Manager Cruz told you not to help Indira." Cooley said, "Like Hell I am." Higgins replied to Cooley stating that she talked to Assistant Quality Manager Cruz who said to Higgins that he told everyone not to help Indira.

54.     On March 14, 2024, Selimovic was placed on a Performance Improvement Plan.

55.     On March 19, 2024, Cooley complained to Human Resources about the manner in which Higgins was harassing Selimovic.

56.     In her written statement to Human Resources, Cooley noted that Cruz and Higgins are doing each other's "dirty work" and that Cruz is setting up Selimovic for criticism by Higgins.

57.     Cooley noted that co-worker Michelle Roome ("Roome"), Quality Engineer, "felt anxiety over the improvement plan given by [Cruz]to Indira, she said it was heavy on her heart because we all seen it coming and it's horrible how when you're a target there is nothing you can do to avoid it."

58.     In her March 19, 2024, written statement to Human Resources, Cooley retold the January 19th incident described above and concluded, "the point of all of this is that this type of behavior happens on a regular basis, its toxic and it's dividing the team. It's stressful for the people receiving the behavior as well as witnessing it. People should not have to tiptoe around Josh [Cruz] and DeAnn [Higgins] in fear of being ambushed by them…Going to HR was a hard choice because nobody wants to be the target of repercussions, but the issue has grown from affecting individuals to affecting the department in general, and now has escaped and made it to the customer which requires someone alerting HR and Leadership that there is unfortunately a very big issue that requires attention."

59.     Human Resources has not disciplined Higgins or opened an investigation into these new allegations.

60.      Cruz was separated from Magna mid-year 2024.

61.     Assistant Quality Manager Smith would see Selimovic stressed out and would encourage her to continue working by saying, "we know who you are and we know who she is, just try to avoid her." Smith often complimented Selimovic for doing a great job and being on top of every quality issue.

62.     Quality Manager Missentzis recognized how abusive Higgins had been toward Selimovic when he said, "it does not matter if Indira did a great job because when that crazy woman [Higgins] comes back into work Monday everything Indira did today will mean nothing or that everything is wrong."

## The Unabated Harassment Makes Selimovic Ill

63.     On May 14, 2024, Selimovic visited the Well Now Clinic located in Port Huron for treatment of severe migraines triggered by Higgins' harassment of her.

64.     On May 15, 2024, Selimovic visited the Emergency Room at McLaren Hospital Port Huron due to severe migraine, nausea, dizziness, vomiting and difficulty breathing caused by the harassment.  During this visit she was diagnosed with stress induced kidney stones. She was discharged from the hospital several hours after visiting the Emergency Room. Selimovic was on medical leave of absence from May 15, 2024, until May 20, 2024.

65.    On May 24, 2024, Selimovic left work mid-shift due to extreme stomach pain and breathing difficulty, requiring another Emergency Room visit at Port Huron McLaren Hospital.

66.    On July 18, 2024, Selimovic worked from 7am to 9:30pm.  She passed out after returning from work.  EMS was called to her home and transported her the Emergency Room at McLaren Hospital in Port Huron. She stayed at McLaren Port Huron overnight and missed the following day of work.

67.    On September 16, 2024, Selimovic visited the Well Now Clinic a second time for severe migraines triggered by Higgins' harassment of her.

**Selimovic is Terminated on Pretextual Grounds**

68.    On November 11, 2024, Selimovic was summoned to the MEVS-MI conference room and met with Smith and Riley, the Human Resources Manager and informed that she had two options regarding her employment at MEVS-MI.  She was told she could accept a severance of 4 weeks or accept a demotion with a 17.5% pay decrease (salary would be reduced from $70,000 per year to $57,780) to a Quality Technician position on the afternoon shift. She was given until December 26, 2024, to accept the demotion or the severance package.

69.    In her role as a Quality Technician afternoon shift her employment would be subject to the discretion of Higgins.  Selimovic as a Quality Technician would start work at 3 pm.  Higgins, who worked first shift, would overlap with

Selimovic from 3 pm to 5pm. Selimovic would have to regularly interact with Higgins and take orders from her which management knew would be intolerable given Higgins' unabated abusive and retaliatory behavior toward her.

70.    Taking the Quality Technician position would be major step back for Selimovic.  The Quality Technician work is in the factory and does not require the skills Selimovic had developed as a JSQE.

71.    In addition, the afternoon shift would take Selimovic away from her family and present a hardship to her.

72.    Smith assured Selimovic that the termination was not based on her performance, but a position elimination based on alleged business needs. Smith acknowledged that Selimovic was proficient in the PPAP protocols.

73.    Magna management had failed to protect Selimovic from the abusive and hostile working environment created by Higgins, and it was an unreasonable request that Selimovic accept a career setback and demotion that would subject herself to further abuse at the hands of Higgins.

74.    The position elimination justification for Selimovic's termination was a pretext for discrimination and retaliation. The evidence of pretext is plentiful:

a.    On the same day as Selimovic's termination, the Company announced it was hiring a new Junior Quality Engineer and a new Quality Supervisor as announced by Karla Xena, Assistant Quality Manager.

b.    Selimovic was qualified to perform the duties of a Junior Quality Engineer and she could have been transferred to this new position.

c.    MEVS-MI decision to Roll Form its own parts rather than purchase the parts from a supplier will increase the supplier quality engineer workload because a full PPAP would have to performed on these in-house parts.

d.    Management was fully aware that Higgins was a disruptive and destructive force in the operation of Supplier Quality management and she, instead of Selimovic, should have been terminated if in fact there was an actual need for the alleged workforce reduction.

e.    Hakes, Selimovic's Quality manager, was NOT involved in the decision to remove Selimovic from her JSQE position. If this employment action was bona fide, Hakes' approval from this employment action would have been expected.

75.    After Selimovic's termination, Cooley met with Hakes to discuss Selimovic's termination. Hakes said to Cooley, "that [Selimovic's termination] is so sad, I feel so bad for her."  Hakes told Cooley that he thought Selimovic "will be better off and happier elsewhere, it's just sad and horrible to have to go through all this."  Cooley remarked, "Yes, it's horrible and cruel."

## Count I: Violation of 42 U.S.C. §§ 1981, 1981a
## Harassment, Retaliation and Termination Because of Ethnicity

76.    Plaintiff incorporates the above allegations by reference here.

77.    42 U.S.C. § 1981 guarantees all persons within the United States the equal right to make and enforce contracts, regardless of race and ethnicity.

78.    Selimovic, as an employee of Magna, had an at-will employment contract with Magna and she was entitled to the advantages and privileges of that contract without regard to her Bosniakian ancestry or ethnic status.

79.    Selimovic is an ethnic Bosniak and practicing Muslim.

80.    Selimovic's ability to read, write and speak English is excellent. However, Selimovic speaks with a distinctive Serbo-Croatian accent.  Selimovic's Serbo-Croatian/Bosniak ethnicity was apparent from her accent.

81.    Magna was prohibited from harassing, retaliating, and terminating Selimovic because of her ethnicity.

82.    Selimovic was harassed and she was ultimately terminated because of her ethnicity.

83.    Selimovic was subjected severe and pervasive harassment because of ethnicity, and after advising Magna of the abusive treatment she was experiencing, Magna failed and refused to take remedial steps to ensure that Selimovic worked in a harassment-free environment.

84.     Magna was prohibited from retaliating against Selimovic because she, or others on her behalf, complained about ethnic discrimination or the harassment she endured at the hands of Higgins and Cruz.

85.     As a result of the ethnic harassment and termination of employment because of her ethnicity or in retaliation for opposing a violation of her rights, Selimovic has experienced a profound loss of wages, benefits, salary and has experienced other economic harm, all of which will continue into the future; Selimovic has experienced devastating emotional distress, humiliation, outrage, mental anguish, loss of reputation , physical injury of a non-disabling nature, pain and suffering, and these non-economic injuries are likely to be present in the future; some or all of Selimovic's non-economic injuries may be permanent in nature.

## Count II:  Violation of ELCRA
### Religious, National Origin and Ethnicity Discrimination
### Harassment, Retaliation and Termination

86.     Selimovic incorporates by reference all of the allegations contained above as stated in full herein.

87.     The ELCRA prohibits an employer from limiting, segregating, harassing, or terminating an employee in a way that deprives her of an employment opportunity because of that individual's religion, national origin or ethnicity.

88.     Magna breached these statutory duties when it terminated Selimovic and permitted her to be harassed after becoming aware of the harassment.

89.     Selimovic at all relevant times was an employee of the Company.

90.     Selimovic was subjected to severe and pervasive harassment by Higgins and Cruz because of her religion (Muslim), national origin (Bosnia) and ethnicity (Bosniak).

91.     Management of the Company received complaints about Selimovic being a victim of workplace harassment at the hands of Higgins, Cruz, and Missentzis directly from Selimovic and her co-workers.

92.     Selimovic's co-workers and members of management created a hostile and intimidating work environment for Selimovic because of her ethnicity, national origin, and religion and because she opposed a violation of her civil rights.

93.     The Company was under a legal obligation to curtail the harassment and provide a remedy to prevent the harassment from recurring.

94.     The Company failed in its duty to curtail and remedy the harassment.

95.     Magna was prohibited from retaliating against Selimovic because she or others on her behalf complained about religious, ethnic, and national origin discrimination or the harassment she endured at the hands of Higgins, Cruz and Missentzis.

96.     As a result of the harassment, retaliation, and termination of employment, Selimovic has experienced a profound loss of wages, benefits, salary and has experienced other economic harm all of which will continue into the future;

Selimovic has experienced devastating emotional distress, humiliation, outrage, mental anguish, loss of reputation , physical injury of a non-disabling nature, pain and suffering, and these non-economic injuries are likely to be present in the future; some or all of Selimovic's non-economic injuries may be permanent in nature.

## REQUEST FOR RELIEF

Selimovic seeks the following relief available under 42 U.S.C. §§ 1981a and 1988 and/or under M.C.L. §§ 37.3801:

A.  Damages equivalent to all lost economic damages and compensation, both past and future, as well as the accrued interest on same.

B.  Compensatory damages for the emotional distress, pain and suffering, and harm to reputation, caused by the Company.

C.  Punitive damages for the willful, intentional discrimination by Magna.

D.  Injunctive relief requiring Magna to reinstate Selimovic and cease discriminatory practices and to eliminate the hostile and intimidating work environment.

E.  Reasonable attorney's fees, including costs and any further relief as the Court deems appropriate.

Respectfully submitted by:

Pitt McGehee Palmer Bonanni & Rivers, PC

By: */s/ Michael L. Pitt*
Michael L. Pitt P24429
James O'Dea (P87859)
117 W. Fourth Street
Suite 200
Royal Oak, MI 48067
248-398-9800
mpitt@pittlawpc.com
jodea@pittlawpc.com

Dated: February 12, 2025

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

Indira Selimovic,

      Plaintiff,

v.

Magna Electric Vehicle Structures —
Michigan, a division of Cosma Canada
USA Group of Magna International Inc.

      Defendant.

Case No.

Hon.

---

PITT, MCGEHEE, PALMER, BONANNI &
RIVERS, P.C.
Michael L. Pitt (P24429)
James O'Dea (P87859)
117 West Fourth Street, Suite 200
Royal Oak, MI 48067
Tel: 248-398-9800
mpitt@pittlawpc.com
jodea@pittlawpc.com

---

### JURY DEMAND

Plaintiff hereby demands a trial by jury of all issues in this action.

Respectfully submitted,
Pitt McGehee Palmer Bonanni & Rivers, PC

By: */s/ Michael L. Pitt*
Michael L. Pitt P24429
James O'Dea (P87859)
117 W. Fourth Street, Suite 200
Royal Oak, MI 48067
248-398-9800
mpitt@pittlawpc.com
jodea@pittlawpc.com

Dated: February 12, 2025