UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

INDIRA SELIMOVIC,

        Plaintiff,                     Case No. 25-cv-10416

v                                    Hon. Susan K. DeClercq

MAGNA ELECTRIC VEHICLE
STRUCTURES – MICHIGAN, INC.,

        Defendant.

_____

| | |
|---|---|
| PITT, MCGEHEE, PALMER BONANNI & RIVERS, P.C. | KIENBAUM HARDY VIVIANO PELTON FORREST, P.L.C. |
| Michael L. Pitt (P24429) | William B. Forrest III (P60311) |
| James O'Dea (P87859) | Thomas J. Davis (P78626) |
| 117 West Fourth Street, Suite 200 | Attorneys for Defendant |
| Royal Oak, MI 48067 | 280 N. Old Woodward Ave. Suite 400 |
| (248) 398-9800 | Birmingham, MI 48009 |
| mpitt@pittlawpc.com | (248) 645-0000 |
| jodea@pittlawpc.com | wforrest@khvpf.com |
| | tdavis@khvpf.com |

_____

## **DEFENDANT'S ANSWER AND AFFIRMATIVE DEFENSES**

Defendant Magna Electric Vehicle Structures – Michigan, Inc. ("Defendant"), by and through its attorneys, Kienbaum Hardy Viviano Pelton Forrest, P.L.C., answers Plaintiff's Complaint as follows:

## INITIAL STATEMENT

Plaintiff has named "Magna Electric Vehicle Structures – Michigan, a division of Cosma Canada USA Group of Magna International Inc." as the Defendant in this case.   Plaintiff was employed by Magna Electric Vehicle Structures – Michigan, Inc., a Delaware corporation, which is the proper Defendant in this case.

## PARTIES, JURISDICTION AND VENUE

1.      Indira Selimovic is a resident of Kimball Township, located in St. Clair County.

**Answer:**

Admitted, on information and belief.

2.      Magna Electric Vehicle Structures—Michigan, is a division of Cosma Canada USA Group of Magna International Inc.

**Answer:**

Defendant admits only that Magna International, Inc., is the ultimate parent company of Magna Electric Vehicle Structures – Michigan, Inc.  Defendant denies

the allegations in paragraph 2 of Plaintiff's Complaint to the extent that they are inconsistent with the foregoing.

3.    The key events in this matter occurred in the Eastern District of Michigan; therefore, venue is appropriate in this Court.

**Answer:**

Admitted.

4.    This Court has subject matter jurisdiction over Plaintiff's claims under 42 U.S.C. §§ 1981, 1981a, and 1988 pursuant to 28 U.S.C. § 1331.

**Answer:**

Defendant admits that this Court has federal question jurisdiction under 28 U.S.C. § 1331 over Plaintiff's claim brought under 42 U.S.C. § 1981.

5.    This Court has supplemental jurisdiction over Plaintiff's state-law claims under 28 U.S.C. § 1367, as the facts related to these claims form the same case as the federal-law claims.

**Answer:**

Defendant admits that this Court has supplemental jurisdiction under 28 U.S.C. § 1367 over Plaintiff's state law claims brought under Michigan's Elliott-Larsen Civil Rights Act.

## STATEMENT OF FACTS

### Description of Magna and MEVS-MI

6.     Magna is a mobility technology company and one of the world's largest suppliers in the automotive space.  Magna's global network includes 342 manufacturing operations and 104 product development, engineering, and sales centers in 28 countries.  Magna has a global team of over 179,000 employees and an organizational structure designed to innovate like a startup. Magna has complete vehicle engineering and contract manufacturing expertise, as well as product capabilities involving body, chassis, exterior, seating, powertrain, active driver assistance, electronics, mechatronics, mirrors, lighting, and roof systems.

**Answer:**

Defendant admits that in paragraph 6 of her Complaint, Plaintiff has partially described non-party Magna International, Inc.

7.     MEVS-MI, located in St. Clair County, opened in 2021.  It recently added a 740,000 square-foot expansion of its existing facility in St. Clair with 920 new jobs expected.  The facility currently supplies steel battery enclosures to General Motors.  The facility produces complex structural battery enclosures for electric propulsion vehicles. The facility builds battery enclosures for General Motor's new GMC Hummer EV. This facility will generate a total private investment of $70.1 million and create more than 300 jobs over the next five years.

**Answer:**

Defendant admits only that it began constructing a facility in St. Clair, Michigan in 2021 and that the facility supplies steel battery enclosures to General Motors for the GMC Hummer EV.  Answering further, Defendant states that in paragraph 7 of her Complaint, Plaintiff has paraphrased February 2021 and October 2022 news releases concerning projected investment and employment numbers at the St. Clair facility that were accurate when written.  Defendant denies the allegations in paragraph 7 of Plaintiff's Complaint to the extent that they are inconsistent with the foregoing.

### Selimovic's Ethnicity and Religion and National Origin and Employment With MEVS-MI

8.     Indira Selimovic is a female born in Bosnia and whose date of birth is November 1973 (age 51).  Selimovic arrived in the United States on May 5, 1998. She is a naturalized citizen.

**Answer:**

Defendant admits only that Plaintiff is a female and that she was born in November 1973.  Defendant lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 8 of Plaintiff's Complaint.

9.     Selimovic is an ethnic Bosniak and practicing Muslim.

**Answer:**

Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 9 of Plaintiff's Complaint.

10.     Selimovic's ability to read, write and speak English as her second language is excellent. However, Selimovic speaks with a distinctive Serbo-Croatian accent. For example, words that start with "w" are pronounced as if the word started with a "v" and words that have the "th" letters are pronounced as if the "th" was

substituted with "dd." Welcome is pronounced as "velcome" and "other" is pronounced as "udder" or "everything" is pronounced "everyting."

**Answer:**

Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 10 of Plaintiff's Complaint.

11.    Selimovic was hired by Magna at its MEVS-MI plant on January 31, 2022, as a Quality Technician. Her duties consisted of inspecting, accepting, or rejecting battery storage units for overall quality and compliance with General Motors Hummer vehicle specifications and completing paperwork documenting the results of her inspection and evaluation.

**Answer:**

Defendant admits only that it hired Plaintiff as a Quality Technician at its St. Clair, Michigan facility on January 31, 2022, and that Plaintiff has identified some but not all of her job duties as a Quality Technician in paragraph 11 of her Complaint. Defendant denies the allegations in paragraph 11 of Plaintiff's Complaint to the extent that they are inconsistent with the foregoing.

12.    Assistant Quality Manager Brandon Smith ("Smith") participated in the hiring of Selimovic.

6

**Answer:**

Defendant admits that Brandon Smith interviewed Plaintiff prior to Defendant hiring her in 2022.  Defendant denies the allegations in paragraph 12 of Plaintiff's Complaint to the extent that they are inconsistent with the foregoing.

13.    Prior to her employment at MEVS-MI, Selimovic worked at SMR Automotive for 23 years.  Selimovic worked her way up from a production employee making automotive mirrors to the paint shop, Team Lead, and finally to the position of Quality Technician.

**Answer:**

Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 13 of Plaintiff's Complaint.

14.    On September 21, 2022, Selimovic was promoted to the position of Junior Supplier Quality Engineer ("JSQE"). This was the position she held on November 15, 2024, the day of her termination. Her annual salary as a JSQE was $70,000 plus an attractive benefits package.

**Answer:**

Defendant admits only that Plaintiff was promoted to the position of Junior Supplier Quality Engineer ("JSQE") on or about September 5, 2022, that her final

annual salary was $73,150 in that job, that she could participate in certain of Defendant's fringe benefit plans as provided in those plans, and that her last day worked in the JSQE job was November 15, 2024.  Defendant denies the allegations in paragraph 14 of Plaintiff's Complaint to the extent that they are inconsistent with the foregoing.

15.     Job duties as a JSQE included being responsible for the inspection area, handling the eRFX Supplier software, managing the Internal Material System (IMDS), daily interaction with suppliers, opening/reviewing Supplier Quality Management Platform (QPF) Reports, training quality and production personnel as required, product kickoffs, coordinating and managing supplier sorts, updating systems as needed (hot list, ignition, inspection control plans), data entry, tracking, and analysis.

**Answer:**

Defendant admits that Plaintiff has identified some but not all of her job duties as a JSQE in paragraph 15 of her Complaint. Defendant denies the allegations in paragraph 15 of Plaintiff's Complaint to the extent that they are inconsistent with the foregoing.

16.    As a JSQE, Selimovic was expected to learn the Production Part Approval Process ("PPAP"). PPAP is a quality protocol developed by the Automotive Industry Action Group to ensure that suppliers produce parts according to specifications and that errors are detected and corrected on a timely basis.

**Answer:**

Defendant admits only that Plaintiff was expected to utilize the Supplier Production Part Approval Process ("PPAP") in her JSQE job and that Plaintiff has partially described PPAP in paragraph 16 of her Complaint. Defendant denies the allegations in paragraph 16 of Plaintiff's Complaint to the extent that they are inconsistent with the foregoing.

17.    According to Smith's evaluation of Selimovic in July 2022, "Indira has good written and oral communication skills" and "clearly communicates to all departments through the facility."

**Answer:**

Defendant admits that in paragraph 17 of her Complaint, Plaintiff has quoted part of a July 2022 performance evaluation that Brandon Smith completed while Plaintiff was working as a Quality Technician. Defendant denies the allegations in paragraph 17 of Plaintiff's Complaint to the extent that they are inconsistent with the foregoing.

9

18.     Selimovic, at the time of her termination, was a highly regarded JSQE who had mastered or was in the process of mastering all the technical requirements of the position.

**Answer:**

Denied.

### Relevant Information about Selimovic's Co-Workers and Supervision

19.     DeAnn Higgins ("Higgins") was promoted to the position of Senior Supplier Quality Engineer ("SSQE") at about the same time as Selimovic with the intention that Higgins would mentor Selimovic.

**Answer:**

Admitted.

20.     Selimovic's supervisor on her last day of work was Quality Manager Tim Hakes ("Hakes"). Hakes became the Senior Quality Assurance Manager in late October or early November of 2024, replacing Scott Missentzis ("Missentzis") who was transferred to the position of Production Manager at MEVS-MI.

**Answer:**

Defendant admits only that Scott Missentzis transferred to the position of Production Manager in late October 2024 and denies the remaining allegations in paragraph 20 of Plaintiff's Complaint.

21.    Selimovic's supervisor was the Quality Manager. Missentzis was Quality Manager from January 31, 2022, until March 2023, when Michael Wallace ("Wallace") was hired as Quality Manager. Missentzis was transferred to the position of Continuous Improvement Manager to make room for Wallace, who was separated from the Company in May 2023.

**Answer:**

Defendant admits only that Michael Wallace was hired as Quality Manager in March 2023 and his employment was terminated in May 2023. Defendant denies the remaining allegations in paragraph 21 of Plaintiff's Complaint.

22.    Missentzis returned to the position of Quality Manager from May 2023 until Jason Lewton ("Lewton") was hired as Quality Manager hired in July 2023 and worked in that capacity until April 2024, when Lewton was separated from the Company. Missentzis returned the position of Quality Manager until Hakes was hired in late October 2024.

**Answer:**

Admitted.

23.     Missentzis was responsible for promoting Selimovic in September 2022 to the position JSQE.

**Answer:**

Defendant admits that Scott Missentzis participated in the decision to promote Plaintiff in September 2022 to the JSQE position.

24.     Higgins, a female who is approximately 55 years old, began her employment with Magna in 2012 as a Quality Technician who in worked on various quality assignments prior to starting at MEVS-MI in September 2021.

**Answer:**

Defendant admits that DeAnn Higgins is female and approximately 55 years old, admits that she worked in different quality assignments, and admits that she started working at Defendant's facility in St. Clair, Michigan in September 2021. Defendant denies the remaining allegations in paragraph 24 of Plaintiff's Complaint.

25.     From September 2022 until mid-April 2023, Selimovic and Higgins were trusted colleagues who were interested in the others' family, regularly

discussed extracurricular activities, and seemed to be concerned about the others' welfare. The text messages between the two co-workers were all positive and friendly.

**Answer:**

Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 25 of Plaintiff's Complaint.

26.    During this period of time, Higgins and Selimovic would exchange photographs of family members, and they routinely shared family news and personal information.

**Answer:**

Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 26 of Plaintiff's Complaint.

27.    Examples of this friendly banter are reprinted below:

> **The September 21, 2022, text message exchange:**
>
> DeAnn Higgins ("DH"): "You did a great job today."
>
> Indira Selimovic ("IS"): "Thank you. That means a lot."
>
> IS: Liked "you did a great job today"
>
> DH: "Yes we do…glad you're my partner"

……………

DH: "Tell Nick (Selimovic's husband) thanks again for the smoothies."

IS: "I did, he said his pleasure, any time :)."

**The April 12, 2023, text message exchange:**

DH: "Karla's birthday is tomorrow…."

IS: "Ok, do you have a card?"

DH: "I will stop at Mayer (sic) before work and get a cake."

……………...

IS: "and I literally drive by Mayers (sic) so no problem at all."

DH: "You're awesome."

**Answer:**

Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 27 of Plaintiff's Complaint.

**Higgins Discovers Selimovic is Muslim and Begins a Bigoted Attack on Her**

28.    Sometime after April 12, 2023, Higgins noticed that Selimovic had scheduled April 21, 2023, as a vacation day. Higgins asked Selimovic if she had

anything fun planned. Selimovic advised Higgins that its "my holiday and I am celebrating with my family."

**Answer:**

Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 28 of Plaintiff's Complaint.

29.    Higgins ask Selimovic, "What holiday?" Selimovic responded by stating Eid, the Muslim holiday celebrating the end of Ramadan.  Higgins googled Eid and pulled up on her computer screen https://en.wikipedia.org/wiki/Eid_al-Fir. After reading the Wikipedia posting, Higgins, while pointed to her computer screen, said to Selimovic, "I didn't know you were this this [Muslim]."

**Answer:**

Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 29 of Plaintiff's Complaint.

30.    Selimovic immediately felt uncomfortable and addressed Higgins' apparent disbelief by stating, "[I am Muslim even though] my eyes are blue, and my hair is not dark."

**Answer:**

Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 30 of Plaintiff's Complaint.

31.    Higgins responded by telling Selimovic that "it's not that I care, I just didn't know."

**Answer:**

Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 31 of Plaintiff's Complaint.

32.    Higgins began treating Selimovic differently after discovering that she was Muslim. For example:

a.    The friendly and supportive test messages for the most part stopped.

b.    Higgins repeatedly laughed at and mocked Selimovic's Serbo-Croatian accent. For example, Higgins would tell Selimovic in the presence of her co-workers to have a "great veekend" and laugh about the mocking. Quality Manager Missentzis, whose office was a few feet from Higgins' workstation/cubicle would join Higgins in mocking Selimovic's accent.

c.    Friendly gestures like sharing snacks were curtailed.

d.    Higgins would insult Selimovic or engage in angry outburst toward her.

e.    Higgins would not train Selimovic on new processes or practices.

16

f.     Higgins assigned Selimovic unmanageable workloads.

g.     Higgins removed tasks from Selimovic which were imperative to solid job performance.

h.     Higgins would alter task assignments and deny that she was altering task assignments.

i.     Higgins would exclude Selimovic from team meetings by not including her on team meeting calendar invites.

j.     During meetings, Selimovic was not allowed to speak or was told to be quiet.

k.     Higgins refused to respond to Selimovic's statements made at meetings.

l.     Higgins falsely accused Selimovic of not following up with suppliers on important issues.

m.     Higgins would nitpick Selimovic's written communications by rejecting communications with trivial errors, like double spacing, missing commas, or the use of insignificant words.

n.     Higgins would publicly show displeasure with Selimovic by sitting at her computer and repeating the word "Fuck" multiple times in quick succession, suggesting that she was fixing Selimovic's errors, causing Selimovic to feel great embarrassment.

o.   Higgins refused to give Selimovic clear instructions, and when Selimovic asked other quality personnel for assistance, Higgins would become irate.

p.   Higgins recruited Assistant Quality Manager Josh Cruz ("Cruz") and Quality Manager Missentzis to assist her in ridiculing, embarrassing, and humiliating Selimovic.

**Answer:**

Defendant denies the allegations in paragraph 32 of Plaintiff's Complaint, including subparts (a) through (p).

33.   Higgins also engaged in unprofessional workplace behaviors unrelated to Selimovic's ethnicity or religion. These unprofessional workplace behaviors were designed to embarrass Selimovic. For example, before Wallace was hired, Selimovic noted to her colleagues that she had worked with Wallace at SMR and that she found him to be a "good" manager. Higgins disliked Wallace before getting to know him and reported him on a Company Hotline as being overly flirtatious with a female subordinate. After Wallace was terminated because of Higgins' complaint, Higgins and Missentzis ridiculed Selimovic because she said he was a "good guy." Higgins then said to Selimovic, "Wallace was respectful towards you because you aren't attractive and because you are old."

18

**Answer:**

Defendant denies the allegations in paragraph 33 of Plaintiff's Complaint.

### Human Resources is Notified that Selimovic is Being Harassed and Fails to Take Prompt and Effective Remedial Action

34.     On September 8, 2023, Quality Manager Lewton called Selimovic into his office and asked her if she was experiencing any problems at work. Unbeknownst to Selimovic, Lewton had received reports from Selimovic's co-workers that she was being harassed by Higgins and that she was showing signs of mental deterioration because of the harassment.

**Answer:**

Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 34 of Plaintiff's Complaint.

35.     Selimovic provided Lewton with an incorrect response: she said everything was "fine." Selimovic's answer was based on her fear that her complaint would result in an increase of Higgins' abusive conduct toward her.

**Answer:**

Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 35 of Plaintiff's Complaint.

19

36.     Between September 8, 2023, and September 14, 2023, Selimovic learned that her co-workers had already informed Lewton of Higgins' abusive behavior toward her. She realized that it was these co-worker complaints made on her behalf that triggered the September 8, 2023, intervention by Lewton.

**Answer:**

Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 36 of Plaintiff's Complaint.


37.     On September 14, 2023, Selimovic returned to Lewton for a private conversation. Selimovic thanked Lewton for his concern and confessed that she gave him an incorrect response on September 8, 2024, and with great emotion described Higgins' harassment.

**Answer:**

Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 37 of Plaintiff's Complaint.


38.     Lewton said to Selimovic, "as you now know the real reason I called you to my office on September 8, 2024, was because your co-workers said you were being discriminated against, humiliated, and made fun of a lot. I have already notified Human Resources."

**Answer:**

Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 38 of Plaintiff's Complaint.

39.     Lewton then walked Selimovic to the Human Resources office. On the way to the Human Resources office, Lewton and Selimovic met Assistant Quality Manager Smith who was always supportive of Selimovic.

**Answer:**

Defendant admits only that on September 14, 2023, Plaintiff, Jason Lewton, Brandon Smith, and Stacie Nolan met in the training room.  Defendant denies the allegations in paragraph 39 of Plaintiff's Complaint to the extent that they are inconsistent with the foregoing.

40.     Lewton, Smith, and Selimovic met with Human Resources representative Stacey Holmes ("Holmes"). Holmes reported to Human Resources Manager Jennifer Riley ("Riley"). Selimovic informed Holmes that the genesis of the harassment was Higgins' discovery that she was Muslim. Holmes asked Selimovic to provide her with a written statement describing the harassment.

**Answer:**

Defendant admits only that on September 14, 2023, Plaintiff, Jason Lewton, Brandon Smith, and Stacie Nolan met in the training room. Defendant further admits that Stacie Nolan worked as a Human Resources Generalist, reported to Human Resources Manager Jennifer Riley, and that Nolan asked Plaintiff to complete a written statement. Defendant denies the remaining allegations in paragraph 40 of Plaintiff's Complaint.

41.     Selimovic provided Holmes with a written statement on September 15, 2023, which reads in part:

> …………………..
>
> Fast forward to like the middle of April, DeAnn seen that I had Friday April 21st as a vacation day. She asked me if I had something fun planned, I said it's my holiday and I am celebrating with my family. She said which Holiday? I responded Eld. She googled and pulled up https://en,wikipedia.org/wiki/Eid al-Fitr. DeAnn said "OH I didn't know you were this." I turned and said "What?" looked at the screen where·DeAnn was pointing to the fact it brought up it was a Muslim holiday. I felt uncomfortable and started explaining probably because my eyes are blue, and my hair isn't dark. DeAnn said something like it's not that I care, I just didn't know.
>
> ………….
>
> After finding out I was Muslim the text and most of the communication. stopped, the relationship shifted. Insulting remarks, attitude, angry outbursts toward me directly, purposefully leaving me out, avoiding training me, removing tasks that are imperative to job performance (Telling me· I can't watch her do a PPAP in QPF because watching is creepy- here is a book instead), giving unmanageable workloads, changing tasks verbally and then going back and saying that's not what she told me, no proof because it was verbal. Changing tasks

22

unnecessarily ("Oh, you just finished updating all control plans, but I added this detail so they all have to be redone now and I need them"), withholding important information, saying she can't join my meeting but then going and starting my meeting on her own without even including me. During meetings even I am not allowed to speak, I am told to be quiet, told she is. Talking or if I do get a chance to speak, she doesn't engage or respond to what I have to say. Lately now I am being left off meeting invites all together.

…………..

I have almost walked away from this career I love numerous times; I feel stuck because she is supposed to be my mentor but treats me like the enemy. She is horrible to me, she is hostile and it's to the point I can't sleep, I am on edge and looking over my shoulder waiting for her next issue.

…………..

**Answer:**

Defendant admits only that Plaintiff has quoted part of a typewritten statement that Plaintiff provided to Stacie Nolan and denies the remaining allegations in paragraph 41 of Plaintiff's Complaint.

42.     Human Resources did not address the complaint with Higgins or launch an investigation into Selimovic's complaints. Neither Holmes nor Riley spoke to Selimovic after the September 15, 2023, written complaint. Selimovic spoke to Riley only once: on the day she was terminated.

**Answer:**

Defendant denies the allegations in paragraph 42 of Plaintiff's Complaint.

23

43.    On September 15, 2023, Missentzis told Selimovic that while she was still at the Human Resources office, Higgins said to him, "oh she is after me, she is with Jason [Lewton] at Human Resources right now."

**Answer:**

Defendant denies the allegations in paragraph 43 of Plaintiff's Complaint.

44.    After Selimovic provided Human Resources her statement on September 15, 2023, Selimovic returned to Holmes on September 18, 2023, to report the retaliation and Higgins' threats like, "snakes, liars, don't bite the hand that feeds you." Selimovic reported that Higgins was swearing, hysterically laughing, and slamming her desk numerous times. She stopped talking to Selimovic completely starting that day and blocked her on social media.

**Answer:**

Defendant denies the allegations in paragraph 44 of Plaintiff's Complaint.

45.    Selimovic's desk was moved September 20, 2023, to the other side of the cubicle section. This move did not curtail the harassment, and this was reported to Holmes. Higgins would still walk around the area where Selimovic's desk was relocated and continue to be verbally rude and make remarks, especially if no one else was present.

**Answer:**

Defendant admits only that Plaintiff was moved to a different cubicle away from DeAnn Higgins in September 2023 and denies the remaining allegations in paragraph 45 of Plaintiff's Complaint.

46.    If Higgins heard Selimovic working and talking to someone else, she would try to approach and isolate Selimovic and the other person, making comments like, "I didn't know there was a training session here," and coming up behind her back and embarrassing Selimovic by saying things like, "Don't you think you should know that?"

**Answer:**

Defendant denies the allegations in paragraph 46 of Plaintiff's Complaint.

47.    Riley never followed up or spoke with Selimovic at all regarding her complaint from September 15, 2023.

**Answer:**

Defendant admits only that Jennifer Riley did not speak with Plaintiff regarding Plaintiff's September 14, 2023 complaint about DeAnn Higgins. Defendant denies the allegations in paragraph 47 of Plaintiff's Complaint to the extent that they are inconsistent with the foregoing.

48.     Missentzis, rather than trying to mitigate Higgins' hostility toward Selimovic, would worsen the environment by asking Selimovic, "Indira, where is your bully?" (referring to Higgins).

**Answer:**

Defendant denies the allegations in paragraph 48 of Plaintiff's Complaint.

49.     Throughout 2023, Selimovic endured escalating bullying, humiliation, the "silent treatment," and discrimination, resulting in a decline of her overall well-being and health.

**Answer:**

Defendant denies the allegations in paragraph 49 of Plaintiff's Complaint.

**During 2024 the Harassment Continues Unabated by Human Resources or Management**

50.     On January 5, 2024, Selimovic and Lewton met with Holmes and advised her that Higgins continued to scream at Selimovic, ridicule her accent, and continued the hostile and intimidating conduct. Holmes listened but took no action to ameliorate the working conditions.

**Answer:**

Defendant admits only that Plaintiff, Jason Lewton, and Stacie Nolan met on January 5, 2024. Defendant denies the remaining allegations in paragraph 50 of Plaintiff's Complaint.

51.     On January 19, 2024, Higgins approached Heather Cooley ("Cooley"), Quality Systems Coordinator at MEVS-MI and Selimovic's co-worker in an effort to get Selimovic in trouble.

**Answer:**

Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 51 of Plaintiff's Complaint.

52.     According to Cooley, "DeAnn [Higgins] approached my desk wanting to compliment me on the email I sent earlier…. I said thanks but I didn't know what email you are talking about. She aggressively shoved the folders that I had hanging over the edge of my desk and said that one you wrote for Indira!"

**Answer:**

Defendant admits that in paragraph 52 of her Complaint, Plaintiff has quoted part of a typewritten statement prepared by Heather Cooley.

27

53.     Higgins pointed her finger at Cooley and said, "you're going to be in trouble because Assistant Quality Manager Cruz told you not to help Indira." Cooley said, "Like Hell I am." Higgins replied to Cooley stating that she talked to Assistant Quality Manager Cruz who said to Higgins that he told everyone not to help Indira.

**Answer:**

Defendant admits that in paragraph 53 of her Complaint, Plaintiff has quoted and described parts of a typewritten statement prepared by Heather Cooley.


54.     On March 14, 2024, Selimovic was placed on a Performance Improvement Plan.

**Answer:**

Defendant admits only that Plaintiff was given a document entitled Developmental/Improvement Tracker that she signed on March 18, 2024.


55.     On March 19, 2024, Cooley complained to Human Resources about the manner in which Higgins was harassing Selimovic.

**Answer:**

Defendant admits only that in March 2024, Heather Cooley complained to Human Resources about behaviors of Josh Cruz and DeAnn Higgins.  Defendant

denies the allegations of paragraph 55 of Plaintiff's Complaint to the extent that they are inconsistent with the foregoing.

56.     In her written statement to Human Resources, Cooley noted that Cruz and Higgins are doing each other's "dirty work" and that Cruz is setting up Selimovic for criticism by Higgins.

**Answer:**

Defendant admits that in paragraph 56 of her Complaint, Plaintiff has quoted and described parts of a typewritten statement prepared by Heather Cooley.

57.     Cooley noted that co-worker Michelle Roome ("Roome"), Quality Engineer, "felt anxiety over the improvement plan given by [Cruz]to Indira, she said it was heavy on her heart because we all seen it coming and it's horrible how when you're a target there is nothing you can do to avoid it."

**Answer:**

Defendant admits that in paragraph 57 of her Complaint, Plaintiff has quoted and described parts of a typewritten statement prepared by Heather Cooley.

58.     In her March 19, 2024, written statement to Human Resources, Cooley retold the January 19th incident described above and concluded, "the point of all of

this is that this type of behavior happens on a regular basis, its toxic and it's dividing the team. It's stressful for the people receiving the behavior as well as witnessing it. People should not have to tiptoe around Josh [Cruz] and DeAnn [Higgins] in fear of being ambushed by them…Going to HR was a hard choice because nobody wants to be the target of repercussions, but the issue has grown from affecting individuals to affecting the department in general, and now has escaped and made it to the customer which requires someone alerting HR and Leadership that there is unfortunately a very big issue that requires attention."

**Answer:**

Defendant admits that in paragraph 58 of her Complaint, Plaintiff has quoted and described parts of a typewritten statement prepared by Heather Cooley.


59.    Human Resources has not disciplined Higgins or opened an investigation into these new allegations.

**Answer:**

Defendant admits only that it has not disciplined DeAnn Higgins as a result of Heather Cooley's statement and denies the remaining allegations in paragraph 59 of Plaintiff's Complaint.

60. Cruz was separated from Magna mid-year 2024.

**Answer:**

Defendant admits that Josh Cruz's employment with Defendant ended in May 2024.

61. Assistant Quality Manager Smith would see Selimovic stressed out and would encourage her to continue working by saying, "we know who you are and we know who she is, just try to avoid her." Smith often complimented Selimovic for doing a great job and being on top of every quality issue.

**Answer:**

Defendant admits only that Brandon Smith complimented Plaintiff at times for doing well on certain tasks and denies the remaining allegations in paragraph 61 of Plaintiff's Complaint.

62. Quality Manager Missentzis recognized how abusive Higgins had been toward Selimovic when he said, "it does not matter if Indira did a great job because when that crazy woman [Higgins] comes back into work Monday everything Indira did today will mean nothing or that everything is wrong."

**Answer:**

Defendant denies the allegations in paragraph 62 of Plaintiff's Complaint.

31

**The Unabated Harassment Makes Selimovic Ill**

63.     On May 14, 2024, Selimovic visited the Well Now Clinic located in Port Huron for treatment of severe migraines triggered by Higgins' harassment of her.

**Answer:**

Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 63 of Plaintiff's Complaint.

64.     On May 15, 2024, Selimovic visited the Emergency Room at McLaren Hospital Port Huron due to severe migraine, nausea, dizziness, vomiting, and difficulty breathing caused by the harassment. During this visit she was diagnosed with stress-induced kidney stones. She was discharged from the hospital several hours after visiting the Emergency Room. Selimovic was on medical leave of absence from May 15, 2024, until May 20, 2024.

**Answer:**

Defendant denies that Plaintiff was on a medical leave of absence from May 15, 2024 until May 20, 2024.  Defendant lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 64 of Plaintiff's Complaint.

65.    On May 24, 2024, Selimovic left work mid-shift due to extreme stomach pain and breathing difficulty, requiring another Emergency Room visit at Port Huron McLaren Hospital.

**Answer:**

Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 65 of Plaintiff's Complaint.

66.    On July 18, 2024, Selimovic worked from 7am to 9:30pm. She passed out after returning from work. EMS was called to her home and transported her to the Emergency Room at McLaren Hospital in Port Huron. She stayed at McLaren Port Huron overnight and missed the following day of work.

**Answer:**

Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 66 of Plaintiff's Complaint.

67.    On September 16, 2024, Selimovic visited the Well Now Clinic a second time for severe migraines triggered by Higgins' harassment of her.

**Answer:**

Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 67 of Plaintiff's Complaint.

**Selimovic is Terminated on Pretextual Grounds**

68.     On November 11, 2024, Selimovic was summoned to the MEVS-MI conference room and met with Smith and Riley, the Human Resources Manager and informed them that she had two options regarding her employment at MEVS-MI. She was told she could accept a severance of 4 weeks or accept a demotion with a 17.5% pay decrease (salary would be reduced from $70,000 per year to $57,780) to a Quality Technician position on the afternoon shift. She was given until December 26, 2024, to accept the demotion or the severance package.

**Answer:**

Defendant admits only that on November 11, 2024, Jennifer Riley and Brandon Smith met with Plaintiff in a conference room, informed Plaintiff that her JSQE position was being eliminated, offered Plaintiff a severance package, and offered Plaintiff the alternative option to take a Quality Technician position with a base pay decrease on the afternoon shift.  Defendant denies the remaining allegations in paragraph 68 of Plaintiff's complaint.


69.     In her role as a Quality Technician afternoon shift her employment would be subject to the discretion of Higgins. Selimovic as a Quality Technician would start work at 3 pm. Higgins, who worked first shift, would overlap with Selimovic from 3 pm to 5pm. Selimovic would have to regularly interact with

Higgins and take orders from her which management knew would be intolerable given Higgins' unabated abusive and retaliatory behavior toward her.

**Answer:**

Defendant denies the allegations in paragraph 69 of Plaintiff's Complaint.

70.    Taking the Quality Technician position would be major step back for Selimovic. The Quality Technician work is in the factory and does not require the skills Selimovic had developed as a JSQE.

**Answer:**

Defendant admits only that the Quality Technician position works on the production floor and denies the remaining allegations in paragraph 70 of Plaintiff's Complaint.

71.    In addition, the afternoon shift would take Selimovic away from her family and present a hardship to her.

**Answer:**

Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 71 of Plaintiff's Complaint.

72.    Smith assured Selimovic that the termination was not based on her performance, but a position elimination based on alleged business needs. Smith acknowledged that Selimovic was proficient in the PPAP protocols.

**Answer:**

Defendant admits only that Brandon Smith informed Plaintiff that her position was being eliminated based on business needs and that Plaintiff was not being terminated for poor performance.  Defendant denies the remaining allegations in paragraph 72 of Plaintiff's Complaint.


73.    Magna management had failed to protect Selimovic from the abusive and hostile working environment created by Higgins, and it was an unreasonable request that Selimovic accept a career setback and demotion that would subject herself to further abuse at the hands of Higgins.

**Answer:**

Defendant denies the allegations in paragraph 73 of Plaintiff's Complaint.


74.    The position elimination justification for Selimovic's termination was a pretext for discrimination and retaliation. The evidence of pretext is plentiful:

a.      On the same day as Selimovic's termination, the Company announced it was hiring a new Junior Quality Engineer and a new Quality Supervisor as announced by Karla Xena, Assistant Quality Manager.

b.      Selimovic was qualified to perform the duties of a Junior Quality Engineer and she could have been transferred to this new position.

c.      MEVS-MI decision to Roll Form its own parts rather than purchase the parts from a supplier will increase the supplier quality engineer workload because a full PPAP would have to performed on these in-house parts.

d.      Management was fully aware that Higgins was a disruptive and destructive force in the operation of Supplier Quality management and she, instead of Selimovic, should have been terminated if in fact there was an actual need for the alleged workforce reduction.

e.      Hakes, Selimovic's Quality manager, was NOT involved in the decision to remove Selimovic from her JSQE position. If this employment action was bona fide, Hakes' approval from this employment action would have been expected.

**Answer:**

Defendant denies the allegations in paragraph 74 of Plaintiff's Complaint, including subparts (a) through (e).

75.    After Selimovic's termination, Cooley met with Hakes to discuss Selimovic's termination. Hakes said to Cooley, "that [Selimovic's termination] is so sad, I feel so bad for her." Hakes told Cooley that he thought Selimovic "will be better off and happier elsewhere, it's just sad and horrible to have to go through all this." Cooley remarked, "Yes, it's horrible and cruel."

**Answer:**

Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 75 of Plaintiff's Complaint.

## Count I: Violation of 42 U.S.C. §§ 1981, 1981a
## Harassment, Retaliation and Termination Because of Ethnicity

76.    Plaintiff incorporates the above allegations by reference here.

**Answer:**

Defendant restates its answers to paragraphs 1 through 75 of Plaintiff's Complaint.

77.    42 U.S.C. § 1981 guarantees all persons within the United States the equal right to make and enforce contracts, regardless of race and ethnicity.

**Answer:**

The allegations in paragraph 77 of Plaintiff's Complaint state a legal conclusion to which no response is required.

38

78.     Selimovic, as an employee of Magna, had an at-will employment contract with Magna and she was entitled to the advantages and privileges of that contract without regard to her Bosniakian ancestry or ethnic status.

**Answer:**

Defendant admits only that Plaintiff was an at-will employee of Defendant Magna Electric Vehicle Structures – Michigan, Inc.  The remaining allegations in paragraph 78 of Plaintiff's Complaint state a legal conclusion to which no response is required.

79.     Selimovic is an ethnic Bosniak and practicing Muslim.

**Answer:**

Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 79 of Plaintiff's Complaint.

80.     Selimovic's ability to read, write and speak English is excellent. However, Selimovic speaks with a distinctive Serbo-Croatian accent. Selimovic's Serbo-Croatian/Bosniak ethnicity was apparent from her accent.

**Answer:**

Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 80 of Plaintiff's Complaint.

81.    Magna was prohibited from harassing, retaliating, and terminating Selimovic because of her ethnicity.

**Answer:**

Admitted.

82.    Selimovic was harassed and she was ultimately terminated because of her ethnicity.

**Answer:**

Defendant denies the allegations in paragraph 82 of Plaintiff's Complaint.

83.    Selimovic was subjected severe and pervasive harassment because of ethnicity, and after advising Magna of the abusive treatment she was experiencing, Magna failed and refused to take remedial steps to ensure that Selimovic worked in a harassment-free environment.

**Answer:**

Defendant denies the allegations in paragraph 83 of Plaintiff's Complaint.

84.    Magna was prohibited from retaliating against Selimovic because she, or others on her behalf, complained about ethnic discrimination or the harassment she endured at the hands of Higgins and Cruz.

40

**Answer:**

Defendant admits only that it was prohibited from retaliating against Plaintiff and denies doing so.

85.    As a result of the ethnic harassment and termination of employment because of her ethnicity or in retaliation for opposing a violation of her rights, Selimovic has experienced a profound loss of wages, benefits, salary and has experienced other economic harm, all of which will continue into the future; Selimovic has experienced devastating emotional distress, humiliation, outrage, mental anguish, loss of reputation , physical injury of a non-disabling nature, pain and suffering, and these non-economic injuries are likely to be present in the future; some or all of Selimovic's non-economic injuries may be permanent in nature.

**Answer:**

Defendant denies the allegations in paragraph 85 of Plaintiff's Complaint.

**Count II: Violation of ELCRA**
**Religious, National Origin and Ethnicity Discrimination**
**Harassment, Retaliation and Termination**

86.    Selimovic incorporates by reference all of the allegations contained above as stated in full herein.

**Answer:**

Defendant restates its answers to paragraphs 1 through 85 of Plaintiff's Complaint.

87.     The ELCRA prohibits an employer from limiting, segregating, harassing, or terminating an employee in a way that deprives her of an employment opportunity because of that individual's religion, national origin, or ethnicity.

**Answer:**

The allegations in paragraph 87 of Plaintiff's Complaint state a legal conclusion to which no response is required.

88.     Magna breached these statutory duties when it terminated Selimovic and permitted her to be harassed after becoming aware of the harassment.

**Answer:**

Defendant denies the allegations in paragraph 88 of Plaintiff's Complaint.

89.     Selimovic at all relevant times was an employee of the Company.

**Answer:**

Defendant admits only that Plaintiff was an at-will employee of Defendant Magna Electric Vehicle Structures – Michigan, Inc.

90.    Selimovic was subjected to severe and pervasive harassment by Higgins and Cruz because of her religion (Muslim), national origin (Bosnia) and ethnicity (Bosniak).

**Answer:**

Defendant denies the allegations in paragraph 90 of Plaintiff's Complaint.

91.    Management of the Company received complaints about Selimovic being a victim of workplace harassment at the hands of Higgins, Cruz, and Missentzis directly from Selimovic and her co-workers.

**Answer:**

Defendant admits only that Plaintiff complained to Human Resources about conduct by DeAnn Higgins and that Heather Cooley complained to Human Resources about conduct by Josh Cruz and DeAnn Higgins.  Defendant denies the remaining allegations in paragraph 91 of Plaintiff's Complaint.

92.    Selimovic's co-workers and members of management created a hostile and intimidating work environment for Selimovic because of her ethnicity, national origin, and religion and because she opposed a violation of her civil rights.

**Answer:**

Defendant denies the allegations in paragraph 92 of Plaintiff's Complaint.

93.     The Company was under a legal obligation to curtail the harassment and provide a remedy to prevent the harassment from recurring.

**Answer:**

The allegations in paragraph 93 of Plaintiff's Complaint state a legal conclusion to which no response is required.

94.     The Company failed in its duty to curtail and remedy the harassment.

**Answer:**

Defendant denies the allegations in paragraph 94 of Plaintiff's Complaint.

95.     Magna was prohibited from retaliating against Selimovic because she or others on her behalf complained about religious, ethnic, and national origin discrimination or the harassment she endured at the hands of Higgins, Cruz and Missentzis.

**Answer:**

Defendant admits only that it was prohibited from retaliating against Plaintiff and denies doing so.

44

96.    As  a  result  of  the  harassment,  retaliation,  and  termination  of employment, Selimovic has experienced a profound loss of wages, benefits, salary and has experienced other economic harm all of which will continue into the future; Selimovic  has  experienced  devastating  emotional  distress,  humiliation,  outrage, mental anguish, loss of reputation, physical injury of a non-disabling nature, pain and suffering, and these non-economic injuries are likely to be present in the future; some or all of Selimovic's non-economic injuries may be permanent in nature.

**Answer:**

Defendant denies the allegations in paragraph 96 of Plaintiff's Complaint.


WHEREFORE,  Defendant  respectfully  requests  that  the  Court  dismiss Plaintiff's Complaint in its entirety, with prejudice, and award Defendant its costs and attorney's fees in defending this action.

Respectfully submitted,

KIENBAUM HARDY VIVIANO
PELTON & FORREST, P.L.C.

By: */s/William B. Forrest III*
    William B. Forrest III (P60311)
    Thomas J. Davis (P78626)
Attorneys for Defendant
280 N. Old Woodward Ave. Suite 400
Birmingham, MI  48009
(248) 645-0000
wforrest@khvpf.com
Dated:  March 26, 2025        tdavis@khvpf.com

45

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

INDIRA SELIMOVIC,

       Plaintiff,                           Case No. 25-cv-10416

v                                         Hon. Susan K. DeClercq

MAGNA ELECTRIC VEHICLE
STRUCTURES – MICHIGAN, a
division of Cosma Canada USA Group
of Magna International Inc.,

       Defendant.

_____

| | |
|---|---|
| PITT, MCGEHEE, PALMER BONANNI & RIVERS, P.C. | KIENBAUM HARDY VIVIANO PELTON & FORREST, P.L.C. |
| Michael L. Pitt (P24429) | William B. Forrest III (P60311) |
| James O'Dea (P87859) | Thomas J. Davis (P78626) |
| 117 West Fourth Street, Suite 200 | Attorneys for Defendant |
| Royal Oak, MI 48067 | 280 N. Old Woodward Ave. Suite 400 |
| (248) 398-9800 | Birmingham, MI 48009 |
| mpitt@pittlawpc.com | (248) 645-0000 |
| jodea@pittlawpc.com | wforrest@khvpf.com |
| | tdavis@khvpf.com |

_____

## **AFFIRMATIVE DEFENSES**

Defendant Magna Electric Vehicle Structures – Michigan, Inc. ("Defendant"), states as follows for its affirmative defenses:

1.      Plaintiff failed to name the proper party to this case.

2.      Plaintiff's claims are barred, in whole or in part, by the relevant statutes of limitation, laches, waiver and/or estoppel.

3.      Plaintiff has failed to mitigate her alleged losses, her entitlement to recovery for which is expressly denied.

4.      Plaintiff is barred from recovering punitive damages for her claims asserted under Michigan law.

5.      Plaintiff is barred from recovering punitive or exemplary damages because Defendant had in place a policy to prevent discrimination and/or retaliation in its workplace and made good faith efforts to implement and enforce that policy.

6.      Plaintiff is not entitled to recover any punitive or exemplary damages and any such allegations should be stricken because:

   a.      Plaintiff has failed to plead facts sufficient to support allegations of oppression, fraud, and/or malice.

   b.      Plaintiff has failed to plead facts sufficient to support allegations of gross or reckless disregard for the rights of Plaintiff or that Defendant was motivated by evil motive or intent.

   c.      Neither Defendant nor any managing agent of Defendant committed any alleged oppressive, fraudulent, or malicious act, or authorized or ratified such an act.

7.     Any and all claims in the Complaint based in whole or in part upon any alleged physical or emotional injury or distress are barred because Plaintiff's sole and exclusive remedy, if any, for such injuries is governed by the Michigan Workers' Compensation Act.

8.     Plaintiff is barred from, and has waived, any recovery for any alleged physical or emotional injury or distress, to the extent that Plaintiff has failed to pursue and exhaust her remedies, if any, under the Michigan Workers' Compensation Act.

9.     Defendant reserves the right to supplement or amend its affirmative defenses.

Respectfully submitted,

KIENBAUM HARDY VIVIANO
PELTON & FORREST, P.L.C.

By: */s/William B. Forrest III*
    William B. Forrest III (P60311)
    Thomas J. Davis (P78626)
Attorneys for Defendant
280 N. Old Woodward Avenue
Suite 400
Birmingham, MI  48009
(248) 645-0000
wforrest@khvpf.com
tdavis@khvpf.com

Dated:  March 26, 2025

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 26, 2025, I electronically filed the foregoing document with the Clerk of the Court using the ECF system which will send notification of such filing to all parties on record, and I hereby certify that I have caused to be served via U.S. mail the foregoing document to the following non-ECF participants:

(no manual recipients)

*/s/William B. Forrest III*
Kienbaum Hardy Viviano
  Pelton & Forrest, P.L.C.
280 N. Old Woodward Ave. Suite 400
Birmingham, MI  48009
(248) 645-0000
wforrest@khvpf.com
(P60311)

561951